# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| | | **DATE** | 4/7/2000 |
| **CASE NUMBER** | 96 C 5571 | | |
| **CASE TITLE** | | Nilssen vs. Motorola | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐    Filed motion of [ use listing in "Motion" box above.]

(2) ☐    Brief in support of motion due _____.

(3) ☐    Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐    Ruling/Hearing on _____ set for _____ at _____.

(5) ☐    Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐    Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐    Trial[set for/re-set for] on _____ at _____.

(8) ☐    [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐    This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■    [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for reconsideration is granted in part and denied in part. (27-1)

(11) ■    [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | APR 10 2000 | |
| ✓ | Notices mailed by judge's staff. | | date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 4/7/2000 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | SN | courtroom deputy's initials | Date/time received in central Clerk's Office | SN  mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OLE K. NILSSEN,                        )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )      No.   96 C 5571
                                       )
MOTOROLA, INC., et al.,                )
                                       )      **DOCKETED**
                    Defendants.        )
                                              **APR 1 0 2000**

## MEMORANDUM OPINION AND ORDER

This opinion both modifies and supplements this Court's

January 7, 2000 Markman ruling (in the "Opinion," 80 F.Supp.2d

921 (N.D. Ill. 2000)[1]) by disposing of two final matters that

complete the task of claim construction undertaken in the

Opinion.  As the first of those unresolved matters, although this

Court did rule in Opinion at 929 that the term "source means" in

United States Patent No. 4,819,146[2] was in means-plus-function

form under 35 U.S.C. §112, ¶6 ("Paragraph 6"), the record was

then undeveloped as to exactly what structure in the

specification corresponds with the claimed function.  Opinion at

929 had therefore contemplated a brief hearing on that issue, but

_____

    [1]  Citations to the Opinion will take the form "Opinion
at --," omitting repetition of the 80 F.Supp.2d volume number.

    [2]  As before, this opinion will refer to each of the patents
at issue by its last three digits.  Hence Patent No. 4,819,146
will be cited as the "'146 Patent."

the parties have since agreed that their paper submissions would suffice instead. Accordingly that question is now fully briefed and ready for decision. As for the second area that requires current attention, Nilssen has filed a motion for reconsideration contending that this Court erred in its construction of four claim elements, and Motorola has responded by asking for reconsideration of a fifth claim.

Because the Opinion included an exhaustive treatment of the background and law related to this case, this opinion can avoid useless repetition on that score. Instead this Court turns directly to the matters at hand.

<u>"Source Means" in the '146 Patent's Claim 19</u>

Claim 19 of the '146 Patent includes as an element:

[a] source means having AC terminals and being operative to provide an AC voltage thereat.

Because this Court determined that the element is in means-plus-function form, it is "limited to the structure set forth in the corresponding structure and its equivalents" (Opinion at 928-29). Corresponding structure is "the structure [that] is clearly linked by the specification or the prosecution history to the function recited in the claim" (<u>Unidynamics Corp. v. Automatic Prods. Int'l, Ltd.</u>, 157 F.3d 1311, 1319 (Fed. Cir. 1998)). As

2

<u>Micro Chem., Inc. v. Great Plains Chem. Co.</u>, 194 F.3d 1250, 1258
(Fed. Cir. 1999) teaches:

> [Paragraph 6] requires both identification of the
> claimed function and identification of the structure in
> the written description necessary to perform that
> function.  The statute does not permit limitation of a
> means-plus-function claim by adopting a function
> different from that explicitly recited in the claim.

Here the function is that of providing AC voltage to the AC

terminals.  But the parties dispute what structure in the

specification is "clearly linked" to that function.  While N.

Source Mem. 2[3] says that the source means "corresponds to an

inverter, or in the alternative, a half-bridge inverter," M.

Source Mem. 2 says that it must be "a self-oscillating inverter,

because that is the only structure disclosed in the '146 patent

---

[3]  Because of the proliferation of legal memoranda resulting
from the current motions, a new set of abbreviations is required
(each using "N." for Nilssen and "M." for Motorola):

     1.  Consistently with Opinion at 924 n.3, the then-
filed memoranda will continue to be cited "Mem." and "Resp."

     2.  Briefs on the "source means" issue--simultaneous-
ly filed originals and simultaneous responses--will be cited
"Source Mem." and "Source Resp."

     3.  Briefs on Nilssen's reconsideration motion will be
cited "N. Rec. Mem.," "M. Rec. Mem." and "N. Rec. R. Mem."

specification."[4]

As for the specification itself, the preferred embodiment states that the "inverter-type power supply" comprises in part ('146 Patent, col. 1, ll. 48-49, 56-58):

> a half-bridge inverter connected with the DC terminals and operative to provide a squarewave output voltage at a pair of inverter terminals....

That language refers to the claimed function, a point that M. Source Mem. 3-4 concedes.[5] But another part of the preferred embodiment also describes the inverter as being "of a self-oscillating type" ('146 Patent, col. 2, l. 20). Moreover, the specification's Details of Operation and Additional Comments use both terms--half-bridge and self-oscillating--in referring to the inverter.[6]

---

[4] Both parties define "source means" in this context as an inverter of some type, because inverters convert DC voltage to high frequency AC voltage.

[5] It is puzzling that Motorola does not include the "half-bridge" characteristic in its proposed structure, even though that feature is more closely linked to the claimed function than the self-oscillating feature (see N. Source Mem. 3-4).

[6] See col. 3, l. 65 ("The operation of the half-bridge inverter..."); col 4., ll. 13-14 ("...the positive feedback circuit of the self-oscillating inverter"); col. 6, ll. 9-10 ("...the half-bridge inverter self-oscillates...."); and col. 6, ll. 15-16 ("...squarewave voltage provided by the half-bridge inverter....").

More importantly, though, the recitations in the specification make it plain that the half-bridge and self-oscillating features of the inverter are mutually exclusive as to the functions they perform.  Nilssen uses that point as a key factor in his syllogistic argument:

1.  Paragraph 6 "does not 'permit incorporation of structure from the written description beyond that necessary to perform the claimed function'...[and] proscribes 'adopting a function different from that explicitly recited in the claim'" (N. Source Mem. 6, quoting <u>Micro Chem.</u>, 194 F.3d at 1258).

2.  Self-oscillation "allows for the control of the inverter's <u>frequency</u> (a different function), not for the provision of AC voltage at AC terminals (the function at issue here)" (N. Source Mem. 6, emphasis in original).

3.  Because the function at issue is that of providing an AC voltage to the AC terminals, and because the self-oscillating characteristic does not lend itself to that function, the source means element cannot be limited to a self-oscillating inverter (N. Source Mem. 8).

Only one possible difficulty may detract from the persuasiveness of that syllogism--the need to reconcile its first

proposition with the proposition that "[a] means-plus-function claim encompasses <u>all structure</u> in the specification corresponding to that element and equivalent structures" (<u>Micro Chem.</u>, 194 F.3d at 1258 (emphasis added)). Both of those propositions stand for the principle that "corresponding structure" under Paragraph 6 is the structure that is "clearly linked" to the claimed function (<u>Unidynamics</u>, 157 F.3d at 1319).

Nilssen's counsel really disserves his own cause by attempting to go farther in N. Source Mem. 3:

> Here, because an inverter--with no other details needed--is sufficient to provide AC voltage at AC terminals, the Court should adopt Nilssen's proposed construction.

Such illogic turns Paragraph 6 on its head by ignoring its limiting effects. As <u>Jonsson v. Stanley Works</u>, 903 F.2d 812, 819 (Fed. Cir. 1990) has reemphasized, quoting from <u>Johnston v. IVAC Corp.</u>, 885 F.2d 1574, 1580 (Fed. Cir. 1989)(emphasis in original):

> Paragraph 6 operates to <u>cut back</u> on the type of <u>means</u> which could literally satisfy the claim language.

Because a generic inverter does not "cut back" on the structure that could perform the claimed function, and in fact does not even correspond with any structural details in the specifica-

tion,[7] Nilssen's overly broad contention must be rejected.

Nilssen fares better with his alternative proposal of a half-bridge inverter, which is the only structure listed in the specification for providing an AC voltage to AC terminals. In that respect Motorola does not dispute Nilssen's second proposition that the self-oscillating feature has no relationship to providing AC voltage to the AC terminals (see M. Source Resp. 3). Instead Motorola simply asks for the total inclusion of all structure attributed to the inverter by the specification. As purported support for that position, M. Source Resp. 3-4 cites three cases for the claimed principle that "[w]here, as here, a patent specification discloses a single embodiment (a self-oscillating inverter), the scope of a means-plus-function limitation is restricted to that embodiment."

That reads too much into the cited authorities. In every instance the structure that they viewed as "corresponding" to the

---

[7] In that regard, as Signtech USA, Ltd. v. Vutek, Inc., 174 F.3d 1352, 1356 (Fed.Cir. 1999) (citation omitted) says:

Although patentees are not necessarily limited to their preferred embodiment, interpretation of a means-plus-function element requires this court to consult the structure disclosed in the specification, which often, as in this case, describes little more than the preferred embodiment.

means-plus-function claim at issue was clearly linked to the claimed function, with the disclosed embodiment representing the preferred means for performing that function. For example, Motorola seeks to rely on <u>Signtech,</u> 174 F.3d at 1356, where the structure corresponding to "ink delivery means" was a "second, high pressure air source." But that second air source was clearly linked to the claimed function, because it was viewed as a key design element for improving the "ink delivery means" over the prior art (<u>id</u>. at 1357). That is equally true of the other two cases cited by Motorola: In each instance the means ascribed to the function was structure that improved the performance of the claimed function:

1. In <u>Cortland Line Co. v. Orvis Co.</u>, 203 F.3d 1351, 1357 (Fed. Cir. 2000) "threaded connectors" were the only structure in the specification corresponding to the means-plus-function limitation (which was a "means for connecting").

2. In <u>Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.</u>, 183 F.3d 1347, 1357 (Fed. Cir. 1999) the "means for supplying gas" function corresponded to a "double-entry" squeezebag because "the specification does not describe a generic squeezebag but rather only a double-entry

squeezebag."

In contrast, the "self-oscillating" feature in this case is not a more detailed or preferred means of performing the claimed function, but instead relates to an entirely different function (that of controlling the inverter's frequency). That brings into play the further teaching of <u>Micro Chem.</u>, 194 F.3d at 1258 (emphasis added):

> Nor does the statute permit incorporation of structure <u>beyond</u> that necessary to perform the claimed function.

By way of analogy, if a two-pronged electrical plug has a third prong for grounding, that third prong may fairly be characterized as structure--but it does not relate to the function of receiving voltage from an outlet. If however the function at issue were that of "grounding means," then the grounding prong (and any other structure used to perform that function) would be relevant.

In sum, just as a generic inverter is not corresponding structure because it does not satisfy Paragraph 6's limiting effects, so attributing the self-oscillating feature to "source means" would add an unnecessary component not at all relevant to the claim. And that is buttressed by the language of the portion of the specification describing the claimed function, which merely says "half-bridge inverter." For those reasons this Court

finds that "source means" corresponds to a half-bridge inverter--that is the only structure in the specification <u>clearly linked</u> to the claimed function.[8]

## Nilssen's Motion To Reconsider

<u>Caisse Nationale de Credit Agricole v. CBI Indus., Inc</u>., 90 F.3d 1264, 1269 (7th Cir. 1996) quotes from an earlier opinion by this Court that our Court of Appeals had then adopted:

> Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence.

Such motions are thus "not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion" (<u>id</u>. at 1270). But as <u>Pickett v. Prince</u>, Nos. 99-2770 and 99-2843, 2000 WL 273993, at *5 (7th Cir. March 14)(citation omitted) observes:

> [A] motion to reconsider a ruling is constrained only by the doctrine of the law of the case. And that doctrine is highly flexible, especially when a judge is being asked to reconsider his own ruling.

What follows is faithful to both of those teachings.

---

[8] N. Source Mem. 4-5 also argues that the prosecution history indicates that the structure of "source means" cannot be a self-oscillating inverter. Because Paragraph 6 calls for that conclusion without reference to the PTO file, it is unnecessary to discuss that point.

Nilssen first urges, quite correctly, that this Court looked at the wrong portion of his Responsive Memorandum for an answer to Motorola's otherwise persuasive argument that the prosecution history limited the actual claim language. Until it reviewed that prosecution history at Motorola's invitation, this Court was prepared to construe "inverter-type power supply" as encompassing "more than one kind of inverter, rather than being limited by a single example in the specification" (Opinion at 932). But because of what this Court then mistakenly understood to be unrebutted prosecution history, Opinion at 933 felt compelled to limit the claims to "a full-bridge inverter." Now a review of Nilssen's actual response calls for a different conclusion.

M. Mem. 23 (emphasis in original) originally argued that the prosecution history reveals that "the only type of inverter disclosed in the '342 Patent is a full-bridge inverter." That contention was supported by (1) Nilssen's statement in the context of an earlier application[9] that his invention was "concisely described" by a claim consisting of an "inverter

_____

[9] Nilssen's statements are highly relevant because the '342 Patent is a continuation of that application, Ser. No. 7/646,497 (see Related U.S. Application Data of the '342 Patent).

means" with the structure of a full-bridge inverter (M. Mem. 23) and (2) Nilssen's statement in the context of a later patent that "[t]o a person having ordinary skill in the particular art to which the claimed invention pertains, it would be clear that the relevant frequencies would be those associated with the full-bridge inverter" (M. Mem. 24). But Nilssen has directed this Court's attention to explanations that materially blunt the force originally ascribed to those statements.

Thus it turns out that Nilssen's first statement was made in response to the examiner's challenge that he demonstrate that his claim language was "supported by disclosures in the specification, as required by paragraph 1 of 35 U.S.C., §112" (N. Resp. 13). In other words, at that point Nilssen was merely highlighting the structure of the full-bridge inverter in the specification to demonstrate that sufficient disclosure existed there to support his claim.

As for the second statement, N. Resp. 13 points out that it was made in connection with a later patent, "a year-and-a-half after the '342 patent issued." Further, that later patent involved the term "substantially higher frequency"--a term that appears nowhere in the '342 Patent. Because the PTO viewed that term as indefinite, Nilssen responded with the words that

Motorola quotes. In short, Nilssen says that the later patent involved an issue totally irrelevant to the claims presently at issue.

Motorola does not suggest anything to undercut those representations by Nilssen, and its memoranda offer nothing to rebut Nilssen's consequent arguments. Instead M. Rec. Mem. 7 seeks to fall back on "the reasons explained" in its original memorandum. But as already indicated, those reasons have been undercut by Nilssen's explanations, so that the cited prosecution history has been shown to be non-relevant.

In light of the arguments that were originally presented by Nilssen but were overlooked by this Court in the parties' paper blizzard, reconsideration is granted in that respect. This Court now holds that the phrase "inverter-type power supply" in the '342 Patent's claims 3 and 5 is not limited by the specification. Instead the phrase is given its well-known meaning in the relevant art as described in Opinion at 932.

### "Inverter Circuit" in the '409 Patent's Claims 9 and 37

Motorola says that if "inverter-type power supply" is given the meaning that this Court has just ascribed to it in the '342 Patent, then this Court is compelled to "reverse itself" and construe claims 9 and 37 in the '409 Patent in accordance with

the patent's specification as being limited to a "full-bridge inverter circuit." As M. Rec. Mem. 7 says:

> Nilssen did not address Motorola's prosecution history arguments regarding the "inverter circuit" of the '409 patent and the Court therefore credited Nilssen with something he did not deserve--a ruling adopting Nilssen's construction of the '409 patent's "inverter circuit" limitation.

In other words, Motorola believes it must prevail because its prosecution history argument (which this Court had found persuasive when it was mistakenly perceived as unrebutted) was the same for both sets of claims,[10] and because this Court had found Nilssen's response unpersuasive as to claims 9 and 37.

But that argument boils down to asking this Court to reach opposite conclusions on what is essentially the same issue, merely because of a poorly organized brief. Though Nilssen's response in the context of the '409 Patent's claim elements is still puzzling, Motorola's prosecution history argument remains the same--and it has effectively been negated by the previously-overlooked portion of Nilssen's original memorandum. Moreover, the written description in the '409 Patent, unlike that in the

---

[10] M. Mem. 27 incorporated Motorola's prosecution history argument regarding the "inverter-type power supply" term in the '342 Patent into its argument as to the "inverter circuit" term in the '409 Patent.

'342 Patent, specifically belies any notion that the inverter is limited to a full-bridge inverter by declaring that the inverter circuit has "at least two periodically conducting transistors" (see Opinion at 936-37). In sum, this Court will not revisit or recast its original construction of the term "inverter circuit."

"Inductor Means" in the '409 Patent's Claims 9, 16 and 37

N. Rec. Mem. 8 next objects to Motorola's "sandbagging tactic" of making a prosecution history argument in its original responsive memorandum that, by reason of the simultaneous briefing schedule, was left unrebutted. M. Resp. 18-19 indeed raised that argument for the first time, and Opinion at 936 n.29 did say that but for the prosecution history it would have sided with Nilssen's construction. Hence this Court will entertain Nilssen's current response in his motion for reconsideration.[11]

At issue in that respect is how broadly or narrowly the term

---

[11] Nilssen has also unfairly sought to criticize Motorola for having successfully asked this Court's colleague Honorable Matthew Kennelly to defer his consideration of similar issues in another case (Nilssen v. Magnetek, Inc., No. 98 C 2229, which has now been reassigned to this Court's calendar) because of Nilssen's motion to reconsider (N. Rec. R. Mem. 2-3, 6). Fortunately for Nilssen, the law has no equivalent to the penalty box in hockey, in which a lawyer (or the lawyer's client) could somehow suffer some adverse consequence in the litigation game for having committed a foul (in this instance, for advancing a truly frivolous argument).

"inductor means" should be construed. Nilssen had argued that the claim language should be given its more general meaning as known by those skilled in the art (N. Mem. 26). But Opinion at 936 accepted Motorola's position that relevant prosecution history called for "inductor means" to be construed more narrowly, as "providing substantially constant current due to the internal impedance in the inductor's windings" (M. Resp. 18).

Two of the three statements cited by Motorola were made by Nilssen in the context of earlier patent applications that eventually spawned the '409 Patent.[12] First, Motorola says that during the prosecution of the '409 Patent, "to overcome a rejection by the PTO, Nilssen contended that the 'inductor means' does <u>not</u> have a single, well-known and definitive structure" (M. Resp. 18). More specifically, to distinguish his "inductor means" from other inductors in the prior art, Nilssen said that

---

[12]  Those were the '381 and '795 Applications. While the '409 Patent is a continuation of the '381 Application, the '795 Application is something like a great-great-grandparent, listed in the '409 Patent's "Related U.S. Application Data" section as having four applications intervening between it and the issuance of the '409 Patent. <u>Jonsson,</u> 903 F.2d at 818 teaches that statements made as to a term in a patent application that ultimately results in the issued patent are "relevant to an understanding" of that same term in the issued patent. Accord, <u>Wang Labs., Inc. v. American Online, Inc.</u>, 197 F.3d 1377, 1384 (Fed. Cir. 1999).

the "Examiner should observe the direction of the inductor coils in [the prior art] arrangement...is exactly the opposite of the way the two coils are arranged in the claimed invention" (M. Resp. Ex. 2, at 3). So, the argument goes, Nilssen should not be able to claim now that "inductor means" includes any and all inductors. Based on that unrebutted argument, this Court accepted Motorola's proposal that the "'inductor means' must provide a total inductance large enough to keep the current flowing from the DC source into the inverter <u>substantially constant</u>" (M. Mem. 27-28, emphasis in original).

N. Rec. Mem. 9 (emphasis omitted) retorts in part that the quoted language "involved different claims in a different application" (the '795 Application). Nilssen, <u>id.</u> goes on to argue that the claim language in the '795 Application "is by its terms expressly drawn to inductors that cause the current to behave in the particular way advanced by Motorola."[13] Because

---

[13] That claim language reads in relevant part ('795 Application at 8, emphasis added):

second inductor means...being inductively coupled to the first inductor means in such manner that any sudden increase in the magnitude of a first current flowing through the first inductor means from the first DC output terminal to the first DC input terminal would result in a corresponding sudden decrease in the magnitude of a second current flowing through the

that more specific claim language was disavowed during subsequent prosecution, N. Rec. Mem. 10 says it "has no applicability whatsoever to the 'inductor means' at issue here...."

Next, M. Resp. 18 had stressed that during prosecution of the '381 Application Nilssen, discussing claim language identical to that ultimately included in the '409 Patent, directed "the PTO--and hence the public--to the portions of the specification of the '409 Patent necessary to identify the particular structure for his 'inductor means.'" Nilssen told the PTO that "[t]he 'inductor means' is represented" in the specification by an inductor that supplies a substantially constant current (M. Resp. 18-19). By way of response, N. Rec. Mem. 11 (emphasis in original) asserts that those statements were answers to "the examiner's contention that Nilssen's claims were not supported or described in the specification, as required by 35 U.S.C. §112."

To be sure, if such supporting statements automatically sufficed to narrow the claim language itself, claims would almost always be as narrow as their referents in the specification. But

---

second inductor means from the second DC input terminal to the second DC output terminal;

whereby any sudden change in the sum of the magnitudes of the first current and the second current is effectively prevented.

Motorola has not had to take such an extreme position.  Instead, both because Nilssen's efforts to explain away the two statements just discussed are not entirely convincing[14] and because he fares even more poorly as to the third statement discussed next, Motorola has effectively torpedoed Nilssen's contention by cutting through Nilssen's verbiage to expose its basic flaw (M. Rec. Mem. 6):

> Nilssen does not--and cannot--deny that he told the PTO and the public to use the specification to determine the meaning of "inductor means."  Instead, Nilssen spends six pages of his reconsideration brief arguing that he should not be bound by his prosecution history admission.

As for that third statement, M. Mem. 19 has cited this passage by the examiner in an office action regarding the application that became the '409 Patent (M. Resp. Ex. 4 at 4):

> Based on the specification, it is construed that...inductor means (IM) has an inductance large enough to cause the current through its windings to be substantially constant.

N. Rec. Mem. 12 (emphasis in original) unconvincingly attempts to

---

[14]  For aught that appears, for example, the sequence of events might reflect Nilssen's having shifted the detailed language calling for a substantially constant current from a claim to the specification in an effort to get past the examination stage with broader claim language than that in the '795 Application.  But whether or not such is the case, the remaining force of all of the pieces of prosecution history adduced by Motorola operates to defeat Nilssen's contention.

counter that by arguing that the statement "does not refer to the claims [but] [i]nstead...to the operation of the ballast circuit as detailed in the specification." And N. Rec. Mem. 13 goes on to urge that the examiner's statement must refer to the specification and not the claim because another term ("saturable transformer means") construed by the examiner in the same document "does not appear anywhere in the claims."

That last effort on Nilssen's part is particularly empty, for the term "saturable transformer means" appears nowhere in the specification either! With nothing having been said to support Nilssen's claimed inference,[15] the earlier-quoted examiner's language remains to haunt Nilssen. And contrary to his argument on that score, both the language used by the examiner and the context of the office action strongly indicate that the application's claims were under discussion. That being so, they reflect the examiner's view of the specification as defining the claim language instead of merely supporting the claim.

---

[15]  Indeed, it would seem extraordinary for a term such as "saturable transformer means" to have been used in the specification if it were not employed in a claim as well. What seems more likely is that the term may have appeared in a claim in an earlier version of Nilssen's application that was later withdrawn. But that possibility need not be pursued further here.

In sum, Nilssen's rebuttal argument may or may not suggest some partial flaws in the examples cited by Motorola in its prosecution history argument. But even those instances evidence Nilssen's successful efforts to get the benefit of patent protection by proffering to the PTO his narrowing constructions of the potentially broader claim language. What Opinion at 936 said remains true:

> Thus Nilssen's generalized attempt to fall back on the general aversion to reading limitations from a specification into a claim is out of place here. Motorola asks that Nilssen be taken at his word, which he gave when it was in his interest to obtain the benefit of the patent he now seeks to sue upon, and this Court honors that request. "Inductor means" will be construed in the manner contended for by Motorola.

### Remaining Claims

Nilssen also asks for reconsideration of "inverter circuit" in the '356 Patent's claim 5 and "power conditioning circuit" in the '067 Patent's claim 32. In those areas Nilssen's respective contentions are that this Court "overlooked Nilssen's [original] arguments" (N. Rec. Mem. 13) and that it committed "a manifest error of fact" (N. Rec. Mem. 15).

Both of those contentions are flat-out wrong: This Court did not overlook Nilssen's argument, and the factual issue had no bearing on the outcome. Instead Nilssen really recycles his

earlier unsuccessful arguments in hopes that this time he will

prevail (something like watching a movie for the second time to

see if the ending comes out differently).[16]  Because those

arguments have already been dealt with, and because Nilssen's

other points are groundless, they will not be exhumed for

reconsideration.

## Conclusion

With all claim construction matters now laid to rest, the

next step in this litigation is expected to depart from what is

normally the next phase of a patent case:  a jury determination

on the issues of infringement and invalidity.  Motorola's counsel

has announced an intention to file a prompt motion for partial

summary judgment to narrow the issues somewhat further before

trial takes place.  This Court will therefore await Motorola's

motion to discuss the necessary scheduling toward that end as

soon as the parties have had the opportunity to digest this

---

[16]  In one of the most foolish pronouncements that this
Court has encountered in almost two decades of reading lawyers'
submissions, N. Rec. R. Mem. 8 (emphasis in original) actually
says:

> Motorola argues that Nilssen's reconsideration motion
> rehashes old arguments.  Clearly that <u>cannot</u> be the
> case because Nilssen's "old arguments" were made <u>before</u>
> the Court issued its <u>Markman</u> decision.

opinion.

_____
Milton I. Shadur
Senior United States District Judge

Date: April 7, 2000